# MONETTA D. GIBBS, Appellant, v. J. F. GIBBS, Respondent.[1]

### No. 1383.    (73 Pac. 641.)

**1. Divorce: Jurisdiction.**

Revised Statutes 1898, section 1208, provides that proceedings in divorce shall be commenced and conducted as proceedings in civil cases, and the court may decree a dissolution of the marriage contract between plaintiff and defendant in all cases wherein the plaintiff for one year next prior to the commencement of the proceedings shall have been an actual and bona fide resident of the county within the jurisdiction of the court for any one of the following causes, including adultery. *Held,* that under Constitution, article 8, section 7, vesting the district courts of the State with original jurisdiction, the district court of the county in which a plaintiff in an action for divorce resided had jurisdiction of the subject-matter of an action for divorce for adultery committed in another county.

**4. Same: Waiver.**

*Semble,* that the defendant's appearance and failure to object that the action should be tried in the county where the alleged adultery was committed constituted a waiver of any objection to the jurisdiction of the court in the county where suit was brought.

**2. Same: Character of Action.**

Where, in an action for divorce, the defendant appears, and joins issue by answer, the nature of the proceeding is thereby changed from a proceeding *in rem* to one *in personam.*

**3. Same: Constitution: Construction.**

Constitution, article 8, section 5, provides that all civil and criminal business arising in any county must be tried in such county, unless a change of venue be taken in such cases as may be provided by law. *Held,* that the word "business," as so used, meant "causes of action," and did not include or apply to any case which did not involve a trial, and is not subject to a change of venue.

**6. Same.**

Constitution, article 8, section 5, provides that all civil and criminal business arising in any county must be tried in such county,

---

[1] Konold v. Rio Grande Wes. Ry. Co., 16 Utah 151, 51 Pac. 256, overruled.

unless a change of venue be taken as provided by law. *Held*, that the word "business," as so used, should be limited to business pending before the court, so that it applied only to actions and other proceedings actually brought. Per McCarty, J.

5. **Same: Stare Decisis.**

Where the question relates to practice and not to substantive law, and no principle is involved that can or will disturb business rules or interests, or affect property rights, the doctrine of *stare decisis* ought not to be applied.[2]

BARTCH, J., dissenting.

(Decided August 15, 1903.)

Appeal from the Fifth District Court, Millard County. —*Hon. Thomas Marioneaux*, Judge.

Action of divorce, instituted in Millard county, on the ground of the alleged adultery of the defendant charged in the complaint as having been committed in Piute county. From a judgment dismissing the action, the plaintiff appealed.

REVERSED.

*J. W. N. Whitecotton, Esq.*, and *Samuel R. Thurman, Esq.*, for appellant.

*Messrs. Warner, Houtz, Prentiss & Warner* for respondent.

BASKIN, C. J.—This is an action of divorce, and was instituted in Millard county. The ground upon which the divorce is sought is the alleged adultery of the defendant, charged in the complaint as having been committed in Piute county. The defendant admitted in his answer that he and the plaintiff are husband and wife, and that the latter now is, and for more than one year last past has been, a bona fide resident of Millard county, but denied that he had committed the adultery

---

[2] Kimball v. Grantsville City, 19 Utah 368, 57 Pac. 1.

alleged in the complaint, ''or with any person or persons or at all.'' No objection was made to the venue of said action in the answer or otherwise. After the respective parties had introduced their evidence. the case was submitted, and the same taken under advisement. Afterwards the court, in a lengthy opinion, held that ''the cause of action, under section 5, article 8, of the Constitution, in which it is provided that 'all civil and criminal business arising in any county, must be tried in such county, unless a change of venue be taken, in such cases as may be provided by law,' arose out of Millard county and in Piute county, if anywhere,'' and that the venue was improperly laid in Millard county, and thereupon dismissed the action.

In this, as in most of the other States, the action for divorce is statutory, and a decree is not obtainable except for the causes and in the manner prescribed by the statute. Section 1208, Revised Statutes, 1898, provides: ''Proceedings in divorce shall be commenced and conducted in the manner provided by law for proceedings in civil cases, except as hereinafter provided, and the court may decree a dissolution of the marriage contract between the plaintiff and defendant in all cases wherein the plaintiff, for one year next prior to the commencement of the proceedings shall have been an actual and bona fide resident of the county within the jurisdiction of the court, for any one of the following causes, to-wit.'' Among the causes thereinafter mentioned is adultery. The provision relating to the residence of plaintiff is mandatory. The plaintiff was precluded thereby from suing for and obtaining a divorce in the county in which the alleged adultery was committed. If, therefore, the construction given to section 5, article 8, of the Constitution, by the court below, is sustained, plaintiff has no remedy whatever. As the subject of divorce is a matter of statutory regulation, it is competent for the Legislature, in granting the right to impose such limitations and conditions as in its wisdom it may deem proper, and generally, in this

country, for the purpose of preventing collusive and fraudulent divorces, the statutes granting the right have, as our statute has done, required the bona fide residence of the plaintiff for a fixed period in the jurisdiction in which the action for divorce is instituted. In view of the prevalence of cases in which persons have become temporary residents in States under whose laws divorces could be readily obtained, for no other purposes than to obtain divorces, such restrictions are salutary, and have been universally sustained by the courts. The conditions upon which the Legislature in this State has granted the right of divorce are valid and binding upon the courts in the absence of a clear and explicit restriction of that right in the Constitution. The Constitution does not define what constitutes a cause of action, nor does it contain any provision from which it can be ascertained where either a local or transitory cause of action arises. Therefore resort must be had to the practice which prevails at common law or in equity. In special statutory causes of action and in criminal causes of action the place where the cause of action arises can generally be determined from the respective terms of the statute. As the defendant appeared in the suit, and filed an answer, and submitted his defense on the merits, the action is *in personam*. When the defendant is a non-resident, and is not personally served with summons, and does not enter an appearance, then the proceeding of divorce is *in rem,* and only the marriage relation can be dissolved by decree; but when he appears and joins issue by answer the nature of the proceeding is changed to that of a proceeding *in personam*, and both the dissolution of the status of marriage and a personal judgment for alimony may be decreed. 1 Nelson on Divorce, sec. 5, pp. 13, 14; 2 Bish., Mar. and Div., sec. 25 et seq., and sec. 81.

In the case at bar the evidence is not in the record, but the defendant is charged with having committed the wrong complained of in Piute county. Suppose that

26 Utah 25

at the time of the alleged adultery the plaintiff had not been, nor has since become, a bona fide resident in any county of the State for the period required by the statute, would either a cause of action or a right of action have accrued in her favor? Certainly not, for the residence of the plaintiff for the statutory period is a traversable fact, which the plaintiff, to recover, must prove. It follows, therefore, that the alleged adultery was not the sole element of plaintiff's cause of action, and that a cause of action for divorce, under the statute, can only arise within the county in which the action is brought, and in which the plaintiff has been a bona fide resident for one year prior to the institution of the suit. The term "all civil and criminal business," as used in section 5, article 8, of the Constitution, does not change the common-law practice in respect to venue in either civil or criminal actions, but is simply an announcement of the common law upon that subject. This court held, in the cases of White v. Rio Grande Wes. Ry. Co., 25 Utah 346, 71 Pac. 593; Konold v. Rio Grande Wes. Ry. Co., 16 Utah 155, 51 Pac. 256; Deseret Irr. Co. v. McIntyre, 16 Utah 402, 52 Pac. 628; Mosby v. Gisborn, 17 Utah 275, 54 Pac. 121; and Condon v. Leipsiger, 17 Utah 501, 55 Pac. 82—that the word "business" was used in section 5, article 8, Constitution, in the sense of causes of action. That that term was used only in that sense is evident from the fact that contested causes of action, and not business transacted by courts or individuals, are alone issuable, and the subject of trials in the civil courts. "A trial is the examination before a competent tribunal of the facts or law put in issue in a cause for the purpose of determining such issue." 21 Am. and Eng. Ency. Pl. and Pr., p. 956. Also Bouvier's, Anderson's, Black's, and Rapalje's Law Dictionaries. It follows that the term "business," when viewed in connection with the context of the clause of the Constitution in question, can not be rationally construed to apply to any case which does not involve a trial, and is not subject to a change of venue. A matter

pending before a court in which there are no contesting parties does not involve a trial in any sense of that word, and a change of venue in such a matter would indeed be a novelty. A trial itself, as also matters not involving a trial, acted upon by a court, in one sense, is court business. From necessity the term "business" can only apply to contested causes of action which alone are issuable and subject to trial. That it was used by the framers of the Constitution only in the sense of "causes of action," and that the proper venue in both civil and criminal actions, as at common law, is the place where the cause of action arises or the crime is committed, to me seems clear.

Again, there is no doubt but that under section 7, article 8, Constitution, which vests the district courts of the state with original jurisdiction, the district court in Millard county has jurisdiction of the subject-matter of this action. Therefore, as it is an action *in personam,* and as the defendant appeared, answered, and submitted his defense upon the merits, he waived all objections to the venue, and the court thereby acquired jurisdiction of his person, and had authority to, and should have, rendered a decree upon the merits. Even in a criminal case the defendant may waive his constitutional right to a trial in the county or district where the crime is alleged to have been committed. Bishop, in his work on Criminal Procedure (volume 1, sec. 50), after referring to the fact that some of the State Constitutions contain direct provisions that the trial shall be in the county, or in the county or district, where the offense was committed, says: "Still this sort of provision, being for the benefit of defendant, may be waived, as, if one applies to the court for a change of venue, he waives his right to be tried in the county where indicted." So, in this State, the clause of the Constitution in question being for the benefit of defendants, the right of the defendant to a trial in the county where the cause of action has arisen is waived in a civil action when the court has jurisdiction of the subject-matter of the suit,

and the defendant appears and answers, without objecting to the venue.   22 Ency. Pl. and Pr., 815, 816; White v. Rio Grande Wes. Ry. Co., 25 Utah 346, 71 Pac. 593; Fields v. Daisy Min. Co. et al., 26 Utah 373, 73 Pac. 521. This decision, and the decision in White v. Rio Grande Wes. Ry. Co., supra, is not in harmony with the decision in the case of Konold v. Rio Grande Wes. Ry. Co., 16 Utah 151, 51 Pac. 256, and the subsequent decisions of this court which sustain that case on the subject of venue, and which was followed by the trial judge in the case at bar.   These decisions on the subject of venue do not establish any rule of property under which titles have been or can be acquired, but merely relate to a rule of practice.   If such had been the case, notwithstanding my opinion that they are erroneous, and that I have, as a member of this court, dissented from the rendition of some of them, I would not assent to their disturbance.

It is ordered that the judgment dismissing the action be, and the same is hereby, reversed, with costs, and that the case be remanded, with directions to the court below to reinstate the same, and proceed to render a decree on the evidence adduced at the trial.

McCARTY, J., (concurring).—There is but one question involved in this appeal, and that is, did the district court of Millard county have jurisdiction of the subject-matter of the action?   The learned judge who tried the case, on the authority of the case of Konold v. Railway Co., 16 Utah 151, 51 Pac. 256, dismissed the action, holding that the court was without jurisdiction. In that case Konold, the plaintiff, who was injured in Emery county, Utah, by the explosion of defendant's boiler, brought an action for personal injuries against the defendant company in Weber county, Utah.   The defendant answered, and a trial was had, which resulted in a verdict in favor of plaintiff.   Defendant appealed, and in this court for the first time, as appears from the record in that case, raised the question of jurisdiction,

claiming that under the provisions of section 5, article 8, Constitution, the district court had no jurisdiction of the subject-matter of the action. The provisions of the State Constitution referred to, so far as material here, provide as follows: ''Until otherwise provided by law, a district court at the county seat of each county shall be held at least four times a year. All civil and criminal business, arising in any county, must be tried in such county, unless a change of venue be taken, in such cases as may be provided by law.'' This court, in construing the foregoing provisions of the Constitution in Konold v. Railway Co., supra, held that: ''The word 'business' was used as a general term to include causes of action and all other business which might arise in any county, and the manifest intention was that all suits, civil and criminal, should be brought and the cases tried, in the county in which the causes of action arose, unless a change of venue should be taken in such cases as might be provided by law. The last clause of the provision confers upon the Legislature discretionary power to provide for a change of venue in cases where that body may deem it necessary; but even in this class of cases the Legislature has no power to authorize an action to be brought, in the first instance, in any other county than the one in which the cause arose.'' And again: ''The interpretation which we are thus impelled to give is also in harmony with all our notions concerning venue, for when we speak of venue we mean the county or jurisdiction in which the acts are alleged to have occurred, and from which the jury are to come to try the issue;'' citing Bouvier's Law Dict. And the court further says: ''It is a fundamental right of every defendant to an action in this state to have the same commenced and tried within the county where the acts are alleged to have occurred, subject to a change of venue in such cases as may be provided by law. To prevent the Legislature from taking away this right, express words of inhibition were not necessary. . . . The declaration itself operated as a restraint upon the legis-

lative power.'' Proceeding further, the court says ''that no demand in writing was necessary or proper [for a change of venue], because the court had no power to grant a change of venue, under the circumstances, but could simply dismiss the case upon becoming aware that the cause of action arose in another county than the one in which it was commenced.'' It will be observed that this court in that case not only held that the word ''business,'' as used in the foregoing provisions of the Constitution, includes the term ''causes of action,'' but also the acts of commission or omission that create and constitute a cause of action. If the court had held that the word ''business,'' as used, was equivalent and meant ''causes of action'' only, and stopped there, then the venue, as fixed by statute, would be the proper place of trial, and, in the absence of statutory regulation on the subject, the rule of common law respecting venue would govern. But, as stated above, the court went further, and held that an action can be brought only in the county where the business arises upon which such action is based; that is, the place of such business fixes the venue in the case, and it matters not whether the right of action is a creature of statute or existed at common law, because the provision of the Constitution referred to includes ''all civil and criminal business.'' Now, in this case, the alleged act of adultery which gave plaintiff a right of action, and which constitutes and is the very essence of her cause of action, was committed, if committed at all, in Piute county, Utah. But counsel for plaintiff contends that, notwithstanding the alleged act of adultery was committed in Piute county, the injury done plaintiff was at her home in Millard county; hence ''the business did not wholly arise in the county where the crime was committed.'' In other words, the adulterous act of defendant in Piute county and the injury it wrought plaintiff in Millard county are two of the elements necessary to constitute her cause of action. Therefore, under the rule laid down in the case of Deseret Irrigation Co. v. McIntyre, 16 Utah 398, 52

Pac. 628, the action was properly brought in Millard county. This theory of counsel for plaintiff is not only unsound in principle, but is in direct contravention of the provisions of section 1208, Revised Statutes, 1898. If the damages suffered by the plaintiff were an essential element of a cause of action in a suit for divorce on the grounds of adultery, then, in accordance with the well-established rules of practice, it would be incumbent upon the plaintiff to allege and prove such damages in order to maintain his action, which, of course, is not required, nor would it be permitted, in an action of this character, where the act complained of is adultery.

Section 1208, Revised Statutes, 1898, so far as material in this case, provides that: ''The court may decree a dissolution of the marriage contract between the plaintiff and defendant in all cases wherein the plaintiff, for one year next prior to the commencement of the proceedings shall have been an actual and bona fide resident of the county within the jurisdiction of the court, for any of the following causes, to-wit: . . . Adultery committed by defendant subsequent to marriage, . . . conviction of defendant for felony.'' It will thus be readily observed from the foregoing provisions of the statute that the adulterous act alone of the defendant, if proved, as alleged, is sufficient of itself, regardless of the effect such act may have had on the mind of the plaintiff at her home in Millard county or elsewhere, to entitle her to a decree annulling the marriage relation. Hence, I fail to see wherein the rule announced in the case of Deseret Co. v. McIntyre, supra, is at all applicable to the case under consideration.

Applying the rule followed in the case of Konold v. Railway Co., supra, to this case, it must be conceded that the ''business'' which gave plaintiff a right of action, and is the very basis of her cause of action, namely, the adulterous act of defendant, arose wholly in Piute county. This being so, if the construction

given the foregoing provision of the Constitution by this court in the case of Konold v. Railway Co., supra, is sound and correct, then it necessarily follows that the trial court did not err in dismissing the case under consideration for want of jurisdiction. For the purpose of illustration, suppose plaintiff, at the time of bringing her action for divorce, had commenced another action for damages against the alleged paramour of her husband, and had alleged the act of adultery complained of in this case as one of a series of acts and circumstances that took place in Piute county from which the inference of alienation of her husband's affections could be drawn, could it be seriously contended that under the rule announced in the Konold case the "business" arose in Millard county? I think not, and yet in the latter case damage would be a constituent and necessary element in the cause of action, which it would be necessary to allege; and, if more than nominal damages were demanded, it would be necessary to prove such damages. Again, for further illustration, suppose that plaintiff, instead of bringing the present action, had instituted criminal proceedings against her husband for the alleged adultery, and had succeeded in getting him convicted, and then had brought her action for divorce, alleging in her complaint that the defendant had been convicted of a felony in Piute county, and the record proof in the case showed such to be the fact, could it be consistently held, in the face of the doctrine declared in the case of Konold v. Railway Co., supra, and reaffirmed by this court in a number of subsequent decisions, that, because of such conviction, the plaintiff may have suffered mental pain and anguish at her home in Millard county, that the "business" (the conviction for a felony) arose (took place) there also? If so, then I fail to comprehend the full import of the expression of the court in that case, notwithstanding the language used appears to be free from doubt and ambiguity.

The fact that the right to sue, under certain circumstances, for a divorce, is a creature of the statute,

does not relieve the situation, because the clause in the Constitution, above referred to, includes all classes of actions that may come before the courts.   Therefore the conclusion is irresistible that, unless the case of Konold v. Railway Co., supra, be overruled, the judgment of the district court dismissing the action must be affirmed, notwithstanding it will result in leaving the plaintiff without a remedy, however meritorious her demands for relief may be; and that, too, in face of section 11, article 1, Constitution, which provides that "all courts shall be open, and every person, for an injury done to him in his person, property or reputation, shall have a remedy by due course of law, which shall be administered without denial or unnecessary delay. . . ."

If the allegations of plaintiff's complaint are true— and, for the purpose of determining the question before us, we must assume them to be true—she has suffered one of the most grievous wrongs that it would be possible for the defendant to inflict.   This being so, the question arises, ought this court to be bound by and adhere to the construction placed upon section 5, article 8, Constitution, in the Konold case, which construction renders abortive section 11, article 1, of the same instrument, when applied to the wrongs sought to be redressed in this case, and many others of a like character that may and probably will arise in the future, when a different construction, of which section 5, article 8, is susceptible, would give full force and effect to both provisions in all cases?   It is an elementary rule of constitutional construction that all parts of a Constitution relating to the same subject should be considered together, and, if it can be done by any reasonable construction, made to harmonize, and every part rendered effective.   In the case of State v. Lewis, 26 Utah 120, 125, 72 Pac. 388 (recently decided by this court), Justice BARTCH, speaking for the court, tersely and correctly stated the rule as follows: "if possible, the whole instrument—every section, every clause, every word—must be given effect.   Where provisions seem to conflict, a construction which will

harmonize them, if practicable, will be adopted, and in construing them it must be presumed that the framers of the instrument used the words in their ordinary and natural sense. One provision of a constitution will not be permitted to defeat another if by any reasonable interpretation both can be given effect." Cooley's Const. Lim., 71-74. When tested by this rule, it becomes apparent to me that the clause of the Constitution which reads, "All civil and criminal business arising in any county must be tried in such county, unless a change of venue be taken in such cases as may be provided by law," means what it says, and says what it means. It must be borne in mind that at the time the constitutional convention adopted the clause referred to and made it a part of the organic law of the State it had under consideration the judicial department of the State, and was dealing with the subject of courts and matters that directly pertained to them. And, the word "business" having been used in connection with the courts, is it not reasonable to presume that the convention intended the term to be used and applied in the sense in which it is generally and popularly understood and employed when applied to courts? "It is a general rule that words of a Constitution must be understood in the sense in which they are popularly employed, unless the context or the very nature of the subject indicates otherwise." Black, Int. Laws, 25; Suth., Stat. Const., 247, 248. In this State custom and usage have given the term "civil and criminal business" a clear and well-defined meaning when used in connection with the courts. When the civil or criminal business of a court is spoken of, it is generally, and I might add universally, understood to mean and refer to the business pending before the court, or that which has been transacted and disposed of by the court. When a heinous and diabolical crime has been committed, the act constituting the crime does not come within the category of the term "business," even though the word be given the broadest and most comprehensive meaning of which it is suscepti-

ble. Therefore I am forced to the conclusion that the word "business," as it is used in the Constitution, refers to matters only that are pending before the court, and not to criminal acts committed for which the culprit may or may not be arrested, prosecuted, and punished, nor to disputes between individuals over commercial and other transactions that may or may not be brought before the courts.

That the foregoing conclusions harmonize with the intent and purposes of the provision of section 5, article 8, Constitution, is evident from the fact that the members of the constitutional convention, in their discussion of this clause of the Constitution at the time it was incorporated into that instrument, made use of the words "business" and "cases" interchangeably. It must be conceded that the word "cases," when used in connection with the courts, refers only to matters pending before them. The term "business" having thus been associated with that of "cases," is it not reasonable to presume that the convention intended it to also include only such matters which have been brought into court, and over which the court has acquired jurisdiction to hear and dispose of? Black, Inter. Laws, 135. An examination of other provisions of the Constitution may shed some light on this much-confused and vexed question. Section 12, article 1, in so far as material here, provides that "in criminal prosecutions the accused shall have the right . . . to have a speedy public trial by an impartial jury of the county or district in which the offense is alleged to have been committed." The provision of the Constitution fixes the venue in criminal cases in the county or district in which the offense is alleged to have been committed. Should the Legislature at any time, because of the limited population or meager revenue of some county, or for any other reason, provide for holding the district court at one place for two or more counties in the district (and the clause "until otherwise provided by law," found in section 5, article 8, Const., implies that the Legislature

may so provide), under this provision of the Constitution the accused in some cases might be tried outside of the county, but within the district, in which the offense is alleged to have been committed. This, however, could not be done if we are to follow the construction given section 5, article 8, in the case of Konold v. Ry. Co., supra, as the foregoing provisions of the Constitution would be in conflict with each other, whereas the construction herein contended for harmonizes those provisions, and gives full force and effect to each. Therefore it is not only allowable, but, in my judgment, it becomes the duty of this court, if it can by any reasonable and practicable construction, to harmonize and render effective the several provisions, even though in so doing it becomes necessary to overrule the case of Konold v. Ry. Co., supra, which case has been fruitful of much confusion and uncertainty in the bringing of actions in this State since the rules therein declared were announced.

The questions and principles involved do not in any way relate to, and would not, in any event, affect, property rights, nor in the least degree disturb business affairs. Therefore the rule of *stare decisis* that impels courts to be bound by and follow, as a precedent, a decision that has declared an unsound doctrine, because of property rights having been acquired and the business affairs of a commonwealth adjusted in accordance with the rules promulgated by such decision, does not control where, as in this case, the principles involved are wholly remedial. In the case of Kimball v. Grantsville, 19 Utah 368, 395, 57 Pac. 1, 8, 45 L. R. A. 628, the court, in discussing this question, say: "Where, however, there has been but a single decision, which is clearly erroneous, and important private or public rights are concerned, . . . or where the points involved were decided contrary to the well-established legal principles which ought to have governed, and injustice or hardship would result, . . . or where it is manifest that the law has been erroneously de-

cided, and no material property rights or business rules have been established thereunder, the doctrine of *stare decisis* ought not to be applied, so as to prevent a reconsideration of the former action of the court. Would it not be an open violation of the rule to declare that a decision, however erroneous, however opposed to legislative enactments or constitutional provision, is nevertheless conclusive evidence of the law, and that the courts make the law, as well as define its application?" The court, after discussing the reason for the rule of *stare decisis,* proceeds: "But the rule does not prevent the use of judicial discretion, in a proper case, where the law has been misconceived or violated; nor does it demand that what is not law shall become the law. Rather it induces the court, if it has digressed from, to return to, well-established principles." Black, in his work on Interpretation of Laws (page 403), says: "If a prior decision is clearly erroneous, whether from a mistaken conception of the law or through a misapplication of the law to the facts, and especially if it is injurious or unjust in its operation, while no injurious results would be likely to follow from a reversal of it, it is not only an allowable departure from the rule of *stare decisis,* but it is the imperative duty of the court to overrule it." Paul v. Davis, 100 Ind. 422; Linn v. Minro, 4 Nev. 462; Rumsey v. N. Y. & N. E. R. R. Co., 133 N. Y. 79, 30 N. E. 654, 15 L. R. A. 618, 28 Am. St. Rep. 600; Callender's Adm'r v. Keystone Mut. Life Ins. Co., 23 Pa. 471; 1 Kent's Comm., 476, 477. There being, as above stated, no principle involved here that will or can disturb business rules and interests, or in any way affect property rights, as the question under consideration relates to practice, and not to substantive law, I join with the Chief Justice in overruling the case of Konold v. Ry. Co., supra, and all subsequent decisions of this court wherein they are in conflict or inconsistent with the conclusions reached in this case.

It therefore necessarily follows that the question as to where civil actions may be commenced must be

determined by reference to the provisions of the statute on this subject, and, in the absence of statutory regula: tion, resort must be had to the rules of common law. As the statute of this State provides that a plaintiff seeking a divorce must bring his action in the county where he resides, the district court of Millard county had jurisdiction of the subject-matter of the action, and the defendant, having answered, without objection, waived jurisdiction as to his person.

For the reasons herein stated, I concur in the opinion of the Chief Justice reversing the judgment, with directions to the trial court to reinstate the case and proceed to render a decree on the merits.

BARTCH, J. (dissenting as to the constitutional construction of the majority of the court in three cases, but concurring in the judgment in each of two of them, and favoring a rehearing in the other).—After careful examination of the opinions of my Brethren, which are now before me as the final expression of their views respecting the questions involved herein, I find myself utterly unable to agree with them in their interpretation of the Constitution. This is also true as to the case of Fields v. The Daisy Gold Mining Co. et al., 26 Utah 373, 73 Pac. 521, respecting the constitutional construction contained in the opinion which is now before me for my consideration, and likewise as to White v. Rio Grande Western Ry. Co., 25 Utah 346, 71 Pac. 593, which case is still before us on petition for rehearing, and in which I concurred in the result, and where one of the district judges, who sat in the case in the appellate court, filed a concurring opinion. Since the same provisions of the Constitution were construed in each of these cases the views herein expressed will, in the main, be applicable to each case. The precise question is whether the legal business arising in any county must be tried in the county where it arises.

It may be observed at the outset that a perusal of the various opinions shows that neither one of my

Brethren agrees with the other, nor is satisfied with the views of the other, as to what is the meaning or the proper interpretation of the important provisions of the organic law with which they are dealing. They appear simply to unite in one thing, and that is, in their hostility to the interpretation which a unanimous court placed upon the same constitutional provisions in the case of Kenold v. Rio Grande Wes. Ry. Co., 16 Utah 151, 51 Pac. 256. That case was decided soon after the adoption of the Constitution, and was thereafter followed by a long line of cases, which with it established the rule of practice that has prevailed in this State ever since. The majority have not only united in hostility to the interpretation of a unanimous court, but in hostility to the evident intention, as I shall attempt to show, of the framers of the Constitution, and of the people—the sovereignty—that adopted it. The gravity of the situation, and what I conceive to be for the best interests of the several counties within this commonwealth and of individuals, impel me to express my views in opposition to the interpretation which is now being placed upon our Constitution. The judicial mind has always approached the construction of the organic law of a section of country with the gravest considerations for the welfare of the subjects and the stability of the government. Especially should such interpretation receive the closest scrutiny when, as in this instance, it is proposed to declare meaningless a plain and unambiguous term employed in the Constitution, and by substitution to overturn the judicially as well as the constitutionally declared policy of the State, respecting the subject affected. The exercise of great caution in such case is due from the interpreters of the law not only as a protection to the best interests of the sovereignty itself, but also out of respect to the wisdom, the integrity, the honor, and the patriotism of its agents who framed the instrument.

When the people within the territorial limits of this State conceived the idea and determined to organize a

constitutional government, the several communities—as is but just to assume—naturally selected from among the foremost of their number the individuals who afterwards assembled in convention and framed the instrument which was to constitute their rule of action. Reference to the roll of the members of that convention discloses many names which are entitled to all the consideration which intelligence and experience, honor and integrity, patriotism and office can bestow. Among them were men of thought, lawyers of ripe experience, writers skilled in the use of the pen and of words. We must assume, because of that decent respect due to their wisdom, their sagacity, and their loyalty to the high and sacred trust reposed in them, that the instrument which was drafted and designed to promote the welfare and happiness of the people of the State received their utmost careful deliberation before it received their final approval and decision. The results of their action, embodying the general measures of utility and the rules of action and practice which they thus adopted and declared for the new government, was the product of the combined thought and skill of that convention, and by adoption became, and is now, the will of the sovereignty. Every department of the State is equally bound to respect it as authority, and the judiciary, whose province it is to interpret it, must, when performing that function, because of the very nature of the instrument and of its paramount character, presume that every word, every phrase, every sentence contained in it received that careful scrutiny from the framers which its importance demanded, and was employed deliberately and designedly. The Constitution thus is the embodiment of the judgment of the representatives who framed it and of the body politic. No tribunal can or ought approach a decision affecting that instrument without entertaining a feeling of profound respect for a judgment supported by such authority; and while a judge, in the examination and decision of a question under it, is not bound to bow to that judgment implicitly,

but must exercise the understanding with which Providence has endowed him, with the independence expected of him by the public, and demanded by the best interests of the government, still he has no right to substitute his own notion of what the phraseology of a particular provision should be for that of the sovereign power, or to assume power to declare meaningless a word, or phrase, or sentence when it does not appear from the context that the same had been inserted into the instrument through mistake or inadvertence of the scrivener, and where there is no ambiguity, repugnance, or conflict.

The provision of the Constitution because of which this controversy arose is found in section 5, article 8, and the section reads: "The State shall be divided into seven judicial districts, for each of which, at least one, and not exceeding three judges, shall be chosen by the qualified electors thereof. The term of office of the district judges shall be four years. Except that the district judges elected at the first elections shall serve until the first Monday in January, A. D. 1901, and until their successors shall have qualified. Until otherwise provided by law, a district court at the county seat of each county shall be held at least four times a year. All civil and criminal business arising in any county, must be tried in such county, unless a change of venue be taken, in such cases as may be provided by law. Each judge of a district court shall be at least twenty-five years of age, a member of the bar, learned in the law, a resident of the Territory or State of Utah three years next preceding his election, and shall reside in the district for which he shall be elected. Any district judge may hold a district court in any county at the request of the judge of the district, and upon a request of the Governor, it shall be his duty to do so. Any cause in the district court may be tried by a judge *pro tempore,* who must be a member of the bar, sworn to try the cause, and agreed upon by the parties, or

26 Utah 26

their attorneys of record.'' The part of this section principally under consideration, reads: ''All civil and criminal business arising in any county, must be tried in such county, unless a change of venue be taken, in such cases as may be provided by law,'' and was incorporated into the section by amendment. 2 Proc. Const. Conv., p. 1503. Before and at the time of the framing of the Constitution the judicial power of the Territory, which was to become the new State, was ''vested in a supreme court, district courts, probate courts, and in justices of the peace'' (1 Comp. Laws Utah 1888, p. 44, sec. 9), and the legal business was then transacted according to the practice at common law, except where otherwise provided by statute. The Territory, in respect to the district courts, was divided into four judicial districts, and causes were frequently transferred from one district to another for trial. Probate courts were held in each county, and had exclusive jurisdiction in matters relating to the estates of deceased persons and of guardianship, and in cases of insane persons. Evidently that system of jurisprudence was unsatisfactory to the framers of the Constitution, for in that instrument they provided that the judicial power of the state should be ''vested in a Senate sitting as a court of impeachment, in a supreme court, in district courts, in justices of the peace, and such other courts inferior to the Supreme Court as may be established by law.'' Section 1, art. 8, Const. It will be noticed that it was a radical departure from the judicial system then in vogue, and we can not assume that it was made without that deliberation which the importance of the subject demanded. That departure at once abolished all the probate courts, held hitherto in every county, and conferred upon the district courts the jurisdiction which, up to that time, had been exercised by the probate courts. It will also be noticed that in section 5, above quoted, provision was made for seven districts instead of four, as under the territory, and that, until otherwise provided by law, a district court is required to be held

at the county seat in every county of the State at least four times a year, instead of in each district as formerly. It seems quite clear, from an examination of the several sections relating to the judicial department as contained in article 8, that a complete system of judicial procedure, different from that which existed in the Territory, was provided for every county in the State. Indeed, that article, as originally drafted, independently of the amendment to section 5, by implication required that all legal business arising in any county must be tried or disposed of in the county where it arises, and such seems to have been the opinion expressed and acquiesced in by the members of the constitutional convention, as appears by reference to the proceedings. 2 Proc. Const. Conv., p. 1503. But how section 5, as amended, and as it finally became a part of the Constitution, can be construed so as to permit the legal business of any county to be tried in some other county than where the business arose, except by change of venue in such cases as may be provided by law, without doing violence to the familiar rules of constitutional construction and the manifest intention of the convention and of the people who adopted the instrument, is utterly beyond my comprehension. And it would seem, from the diversified opinions, that the judges who have precipitated so grave a question, once settled and understood, again into the vortex of uncertainty, are themselves not altogether free from doubt as to their conception of what the language which they have construed means, having completely failed to convince each other as to what the correct interpretation is.

Mr. Chief Justice BASKIN, however, in White v. Rio Grande West. Ry. Co., supra, says: ''Although 'business' is a word of extensive signification under any legal or general definition of the term, it is meaningless in the connection in which it is used in the Constitution, and the clause in which it occurs can be made intelligible only by substituting in its place the words 'causes of action.' . . . It is apparent from the con-

text of the clause of the Constitution before quoted that it was the intention of the framers of the Constitution to require criminal and civil causes of action arising in any county to be tried in such county, unless the venue should be changed; and, as business is not one of the elements of either an action, or of a cause of action, or a right of action, especially in respect to criminal actions or actions arising from torts, it is equally apparent that that word was erroneously used instead of the term 'causes of action.' Therefore, in construing the clause under consideration, the latter words must be substituted for the former. The clause, after the substitution, is still so indefinite and general as to render it necessary in each case in which the venue is made an issue to resort to the common law in order to determine whether the venue has been properly laid."

In Fields v. Daisy Gold Min. Co., supra, he says: "in order to render the provisions of the Constitution in question intelligible, the term 'causes of action,' as held in White v. Rio Grande Wes. Ry. Co., supra, must, in construing said section, be substituted for the word 'business.' When so substituted the provision in question is simply a declaration of the common law on the subject of venue." The same construction prevails in this case. Thus my learned Brother deliberately strikes out of the organic law the word "business," the meaning of which is well understood in common as well as legal parlance; substitutes in lieu thereof the words "causes of action;" and characterizes that word of plain and comprehensive signification as meaningless in the connection in which it is used. He says the clause in which it occurs can only be made intelligible by substitution, and that, as the word is not an element of an action, or cause of action, or right of action, it is apparent that it was erroneously used instead of "causes of action." Is it possible that the members of the constitutional convention were guilty of such a reckless use of words as is thus indicated? Is it possible that they performed the high and sacred

functions, intrusted to them by a confiding people, with such stupidity? Can it be that in attempting to change a judicial system, as we have seen, because it was unsatisfactory, in a vital provision of the Constitution they used a meaningless word, and thereby perpetuated the very system in practice which they sought to change? That they used the word deliberately is clear from a perusal of the record of their proceedings, to which reference has hereinbefore been made. If it was deliberately employed, were, then, those men, among them lawyers of much experience, writers of acknowledged ability skilled in the use of language, nevertheless guilty of using a familiar word, in an important provision of the supreme law of the State, in such a way as to render it meaningless, and thwart the very object which they were aiming to accomplish, which was the changing of the then existing policy respecting the proceedings of courts? Let us see, then, whether it is "equally clear" from the context that the word "business" was used erroneously for the words "causes of action." Making the substitution as outlined by the learned Chief Justice, the provision in question reads: "All civil and criminal causes of action arising in any county must be tried in such county, unless a change of venue be taken, in such cases as may be provided by law." My Brother says, in the White case, supra, that "the constituent elements of a legal cause of action consist of a wrongful act by the defendant, or the omission by him of a legal duty which he owes to the plaintiff, and of either the material damage to the plaintiff caused thereby or of the damage which the law implies therefrom." In Fields v. Daisy Gold Min. Co., supra, he quotes approvingly from the opinion of Mr. Justice Cooley in Post v. Campau, 42 Mich. 96, 3 N. W. 275, as follows: "The elements of a cause of action are, first, a breach of duty owing by one person to another; and, second, a damage resulting to the other from the breach." It will thus be observed that, according to his own conception of the meaning of the term "causes

of action," it embraces only that part of the legal busi-
ness, to be tried by a court, which arises out of a wrong
done by the defendant, either by commission or omis-
sion, and the damage caused thereby, or, in other words,
out of a breach of duty by one person and the damage
resulting therefrom to another. Here, then, according
to his own construction and definition of the term, is a
clear limitation to business wherein there is a party
plaintiff and a party defendant. What, then, may I
ask, is to be done with a case or business which does
not arise because of a breach of duty owing by one re-
sulting in damage to another? Where is that class of
business to be tried by the district courts?

As we have seen, the framers of the Constitution,
in their wisdom, saw fit to abolish the probate courts,
and confer upon the district courts jurisdiction of the
business which those courts, in the territorial days, tried
or transacted. It can hardly be denied that the great
mass of cases tried by those probate courts were not
such as are embraced or included within the technical
term "causes of action." For instance, can it be said
that a petition for letters of administration of the es-
tate of a deceased person, or for letters of guardian-
ship, or an application for the sale of real estate or per-
sonal property, or for the allowance of an administra-
tor's or executor's account, or a petition in lunacy, es-
pecially in the absence of any contest, is the result of a
cause of action, and included in the provision of the
Constitution under consideration, as his Honor con-
strues it? Surely no case in any of these classes arises
because of a breach of duty owing by one person and
damage resulting to another from the breach, and yet
all such cases, with other special matters and proceed-
ings, not constituting actions or an action, are within
the jurisdiction of, and must, under the Constitution,
be tried by the district courts. Now, I apprehend that
no one will be willing to undertake to maintain that
causes of action and their trial do not constitute business
in court, nor that the trial of probate and special mat-

ters do not likewise constitute business in court; and if it be the case—as it would seem all must admit upon reflection—that causes of action and probate and other special proceedings all alike constitute business, then was not the use of the word "business," the comprehensive, general term, in the Constitution, vastly more fortunate than would have been the use of the words "causes of action," the restricted technical term? Was it not wisdom that, upon the framers of the Constitution having abolished the probate courts, and given enlarged general jurisdiction to the district courts, dictated the use of the word "business" as the appropriate term to carry out their designs? Is it not clear that they employed that word understandingly, deliberately, and from choice? How can it be said, when the purposes and objects, as they appear from the instrument itself, are considered, that the word was used erroneously? As we have seen, the undoubted purpose of the framers of the Constitution was to adopt a judicial policy other than had hitherto prevailed in the Territory, and different, in the rules of practice, respecting venue, from that existing at common law; and, to make the change from the common law in these particulars certain, they inserted into the article on the judicial department the provision in question by amendment; which provision is peculiar to our Constitution, not, so far as I have ever been able to ascertain, being found in any other. But, notwithstanding all this, my learned Brother says the rules of practice relating to venue are still the same as at common law and under other Constitutions. At all events, such is the result of his construction placed upon the provision in question. If this is true, then it convicts the members of the constitutional convention of doing an absurd thing—of placing into the organic law a senseless and useless provision. But by what rule of construction can such a result be justified as to a constitutional provision which is neither ambiguous, nor repugnant to, nor in conflict with any

other provision in the instrument, especially when another construction gives the clause effect?

It is a cardinal rule of constitutional construction that every word, phrase, and sentence—the whole instrument—must, if possible, be given effect, and if, from the imperfection of human language, there are grave doubts as to the meaning intended, or as to the extent of any power given, then the well-settled rule is that the objects and purposes which induced the grant of the power, especially if they can be ascertained from the instrument itself, should have great influence in the interpretation. "We know of no rule," says Mr. Chief Justice Marshall, "for construing the extent of such powers, other than is given by the language of the instrument which confers them, taken in connection with the purposes for which they were conferred." Gibbons v. Ogden, 9 Wheat. 189, 6 L. Ed. 23.

Again, in this case my Brother, referring to the word "business," says: "That that term was only used in that sense [sense of "causes of action"] is evident from the fact that contested causes of action, and not business transacted by courts or individuals, are alone issuable, and the subject of trials in the civil courts," and defines the word "trial" as "the examination before a competent tribunal of the facts or law put in issue in a cause for the purpose of determining such issue," and then says: "It follows that the term 'business,' when viewed in connection with the context of the clause of the Constitution in question, cannot be rationally construed to apply to any case which does not involve a trial, and is not subject to change of venue. A matter pending before a court in which there are no contesting parties does not involve a trial in any sense of that word, and a change of venue in such a matter would indeed be a novelty." To me the law, as thus stated by my learned Brother, is much more of a novelty than would be a change of venue as to matters not issuable, but which are subjects to be investigated and disposed of by the court. Indeed, such

law seems to be an anomaly in constitutional construction. Of course, no one pretends that the word "business," as used in the provision under consideration, was intended by the framers of the Constitution to embrace the ordinary private business of individuals. When those framers inserted that clause into the Constitution they were dealing with courts, and matters to be disposed of by them, and not with private business matters, with which the courts have nothing to do; and when they used the term "business" they used it with reference to legal matters to be transacted in court, whether issuable or not. This seems too clear from the context, as well as from reason, for argument. The clause in question makes no distinction whatever between matters issuable and matters not issuable, and the word "trial," which my Brother defines, is not used in the provision at all. The word "tried"—the past tense of "try"—is used, and Webster defines "try:" "To examine or investigate judicially; to examine by witnesses or other judicial evidence and the principles of law." Such is the ordinary legal meaning of the word "try," and this is the sense in which the word "tried" was employed. The word "business," therefore, was clearly intended to include all matters which were to be examined or investigated judicially by the courts, and not simply issuable matters or causes of action. Does not, then, the Chief Justice, when he resorts to the word "trial," which nowhere occurs in the provision, and by a very restricted technical definition thereof limits the signification of the word "business," himself create a novelty in constitutional construction? Surely, I know of no rule of construction which has been hitherto announced that permits this. Is it not manifest that my Brother's conclusion that the term "business" cannot be rationally construed to apply to any case which does not involve a trial and is not subject to a change of venue, and that a matter in which there are no contesting parties is not subject to a change of venue is wholly unwarranted under the language of the

Constitution? Courts are constantly called upon to try matters that are not issuable in the technical sense, and in which there are no contesting parties. Such are most matters of probate. For example, when a petition for letters of administration is filed, the court investigates the case, examines the evidence of witnesses and other legal evidence, applies the principles of law; in other words, tries and decides the case, although there be no contesting parties whatever. Can it be said that this is not "business," in the ordinary meaning of the term —the sense in which it was employed in the Constitution? Suppose in such case the judge in whose court the petition is filed is disqualified because of his interest in the estate, or for other cause, is it possible that no change of venue can be granted, or that a change of venue would be a novelty? Undoubtedly the Legislature may provide for, and courts may grant, a change of venue as to cases not amounting to causes of action, where there is no issue in the technical sense of that term, and where there are no contesting parties. Evidently many such cases arise in probate proceedings, all of which are included within the term "business" and the constitutional provision as to change of venue, but not within the term "causes of action." In my judgment, therefore, no judge is justified in substituting the restricted technical term "causes of action" for the comprehensive, general word "business." I regard it clear from the authorities, as also upon principle, that substitution, in the construction of a constitutional provision, is never justified, unless a mistake in the use of a word is clearly manifest from the context. In this case a mistake is not only not manifest, but it is plainly apparent from the context of the provision in which the word occurs, and from the whole article, of which the provision forms a part, that the word was used designedly, and that it is the most fortunate term to give expression to and to effectuate the purposes and objects of those who employed it. The fallacy of my Brother's construction lies in the fact that by substitution

he strikes out a general term, applicable to many subjects, and inserts one of its significations. Business undoubtedly means causes of action, but it means something more. It means as well cases and matters to be tried in the courts, and which, as we have seen, are not included within the term "causes of action." I have never before seen a case where such a construction of a constitutional provision was, under such circumstances, attempted, and I apprehend the history of jurisprudence will be searched in vain for a parallel.

The Konold case, supra, and several other Utah cases, are cited, but in none of them was there a substitution made, and in the Konold case this court by unanimous decision said: "The word 'business' was used as a general term to include causes of action and all other business which might arise in any county." This was in reference to legal business to be transacted in court. No judge of this court, prior to the White case, supra, has ever attempted to substitute, in an opinion of the court, "causes of action" for the word "business." The Chief Justice says: "When so substituted, the provision in question is simply a declaration of the common law on the subject of venue." He thus impliedly admits that, in the absence of such substitution, the provision is not a declaration of the common law on the subject of venue. But what right has a court or judge to change, by substitution, a provision of a Constitution that is not a declaration of the common law into one that is? And if the provision, as thus construed, is simply declaratory of the common law, then of what use is it in the Constitution? Why not strike out the entire provision as useless and meaningless, instead of substituting one term for another, which renders it so? The common law would prevail without any provision declaratory of it. This court has frequently held that the common law is in force in this State where not superseded by constitutional or statutory provision. It was so under the Territory, when the Constitution was being drafted, and the men

who drafted it must be presumed to have been aware of such fact. These absurd results show how dangerous it is for a court to depart from the language expressed in a constitution, how dangerous it is for a court to substitute its notion of what a provision ought to be for what it really is. If a plain provision of the organic law can be thus altered by judicial construction, what guaranty is there that other provisions may not likewise be changed, until the whole instrument becomes mutilated, and the will of the sovereignty becomes the mere will of the judges? Under this innovation upon the familiar rules of constitutional construction, it seems to me the door is wide open to declare any provision of the Constitution to be just what the judges think it ought to be, not what the instrument itself shows it to be.

Let us now examine Mr. Justice McCARTY'S interpretation. He says the provision in question "means what it says and says what it means." Now, if my Brother had stopped right here, I would have taken no exception to his construction; but he goes on, and says: "I am forced to the conclusion that the word 'business,' as it is used in the Constitution, refers to matters only that are pending before the court." As will be noticed, this construction restricts the meaning of the word "business" to matters only that are "pending before the court." The Constitution says "business arising in any county," and so my Brother substitutes by implication the phrase "pending before the court" for the word "arising," and thus the provision as reconstructed by him would read: "All civil and criminal business pending before the court in any county must be tried in such county," etc. So that, after all, the provision, as contained in the Constitution, does not say "just what it means," for it says "business arising," while his Honor says it means only "business pending before the court." According to this construction, the word "business" does not include causes of action accrued, nor probate and other legal matters existing in the

county, but which have not yet been actually brought into the court in the county; and the question is, where must they be brought and tried? Does such a construction, leading to such results, do justice to the wisdom and patriotism of the able men who framed our Constitution? Does it not establish a dangerous precedent to look so lightly upon the language employed in the organic law of our State?

In support of his interpretation the learned Justice quotes the familiar rule of constitutional construction that, "if possible, the whole instrument—every section, every clause, every word—must be given effect;" but does he give effect to the word "arising?" Is it not clear that he violates the very rule which he claims to invoke? Without pursuing this construction further—which, in my judgment, is clearly erroneous—I will simply say that the observations made herein as to the interpretation of the Chief Justice apply equally to this. For the purposes of comparison, however, it may be well here to restate the products of substitution express and implied. They are as follows: (1) "All civil and criminal causes of action arising in any county must be tried in such county," etc. (2) "All civil and criminal business pending before the court in any county must be tried in such county," etc. Such are the substitutes now produced by judicial construction for what seems to me to be a plain and unambiguous provision of the Constitution reading: "All civil and criminal business arising in any county must be tried in such county," etc., and which has been upheld, as it stands, by this court, in numerous cases.

It will be noticed that my Brethren are not very harmonious as to just what the substitute should be. As to which one is finally to stand as the rule of action in this State, neither one of their opinions discloses; and, as both are so utterly at variance with my understanding of the rules of construction, I am unable to concur with either. I cannot give my judicial consent to any construction of the Constitution which, in my

judgment, is not only violative of the familiar rules of constitutional construction, and of the manifest intention of the framers of the instrument and will of the people who adopted it, but also revolutionary, in that it overturns the settled policy of the commonwealth as inaugurated by the organic law. While it is the province of judges to construe the Constitution, still they are equally bound with all other officers and subjects of the government to observe and obey its mandates, and not for light reasons to declare its terms meaningless, nor to so construe it as to render useless a single word or sentence where another reasonable construction will give it effect. Though judges of a court of last resort, we are yet servants, yet subjects bound absolutely by the declared will of the sovereignty.

I also disagree with my Brethren respecting venue and jurisdiction under the same provision of the Constitution. In the White case, supra, the Chief Justice says: "The clause of the Constitution requiring actions arising in any county to be tried in such county does not affect the general jurisdiction of the district courts. Therefore the court below had jurisdiction over the subject-matter of the action, and a defendant can waive his right, under the Constitution, to have an action against him tried in the county where the cause of action arose." This evidently results from his construction rendering the provision in question simply declaratory of the common law, as was hereinbefore shown. The provision, as has been observed, being construed away as meaningless and useless, he logically and naturally applies the rule of the common law as to venue and jurisdiction. These conclusions of the Chief Justice have been followed in the Fields case and in this one, in both of which cases Mr. Justice McCARTY concurs on this point. Just how he can do this, being unwilling, as I have already shown, to brush aside the word "business," and hold the constitutional provision meaningless and useless, I am unable to comprehend. His opinion does not seem to make this clear, at least

not to my mind.   Surely, if that provision and the one
found in article 1, section 26, Constitution, have any
force, the place of bringing a suit and of trial cannot
be waived in this State.   Now, let us look at these pro-
visions in the light of the elementary rule stated by
him that "all parts of a constitution relating to the
same subject should be considered together, and, if it can
be done by reasonable construction, made to harmonize
and every part rendered effective."      Again stating
the provision in section 5, article 8, it is: "All civil and
criminal business arising in any county must be tried
in such county, unless a change of venue be taken, in
such cases as may be provided by law." The one in sec-
tion 26, article 1, reads:   "The provisions of this Con-
stitution are mandatory and prohibitory, unless by ex-
press words they are declared to be otherwise."      As
will be noticed, this last provision clearly relates to the
one in section 5, because that is not declared to be other-
wise than mandatory and prohibitory, and therefore
relates to the same subject, so that, according to the
rule of construction relied upon by Mr. Justice Mc-
CARTY, the two provisions must be considered together
and both be given effect, if it can be done.   That they
can and ought to be considered together and be given
effect is too apparent for argument, for neither con-
flicts with the other, and both are expressive of the in-
tent of the framers of the Constitution.   The provision
in section 5, however, standing alone, is in form manda-
tory.   It is true the word "must" is sometimes con-
strued as "may"—permissive—but this only when the
context requires it.   Here the context plainly shows the
provision to be mandatory.   It is a command, and hence
the word "must" cannot be construed as permissive, but
must be given the signification which it imports.   That
the intention was to make this provision in effect man-
datory is also clear from the fact that the words "civil"
and "criminal" are employed in the same connection,
civil business and criminal business being all placed in
the same category.   Now, from time out of mind, when

a person was indicted for murder, for instance, a criminal offense, the prosecution had to be instituted in the county or jurisdiction where the offense was committed, and tried there, unless a change of venue was granted according to law. In such case the place of trial was jurisdictional. This was so at common law, and undoubtedly was known to the framers of the Constitution, many of whom were experienced lawyers, as appears from the list of names, familiar with the criminal law and rules of criminal procedure. They were also aware that at common law, as a general rule, in civil proceedings, the defendant might waive the place of trial. When, therefore, they placed civil and criminal business in the same category, is it not clear that their intention was to require civil as well as criminal cases to be commenced and tried in the county where the business arose? The context thus plainly indicates the intention of the framers of the Constitution and the mandatory character of the provision. That all cases must be commenced, in the first instance, in such county, is also clear from the clause respecting the change of venue; for it will doubtless be conceded that no change of venue can be taken in any case until suit has been brought. Suppose, however, there should be some doubt of the mandatory and jurisdictional character of this provision, then by construing this provision and the one of section 26 together, under the rule stated, it would certainly seem that all such doubt would be removed, for by considering both provisions together, and giving each effect, they would be the same as if the language of the one in section 5 were: "All civil and criminal business arising in any county must be tried in such county, unless a change of venue be taken in such cases as may be provided by law, and this provision is mandatory and prohibitory." The effect of this language would manifestly be that all civil and criminal business—that is, causes of action, probate matters, and special proceedings not amounting to a cause of action—which might arise in any county would have to be

tried in the county where it arose and could be tried in no other county or jurisdiction, except in cases where a change of venue was provided by law. Surely my Brethren will not undertake to maintain that the sovereign power of the State cannot confer upon district courts general jurisdiction of subject-matter, and at the same time confine such jurisdiction within certain prescribed territorial limits. If it is within the power of the sovereignty to do this—which, it seems, all must admit—then, indeed, it is difficult to perceive how it could be done in much clearer and plainer language than that employed in the two provisions here being considered, or how the intention to make a provision mandatory could be made more apparent from the context. That the framers of the Constitution intended to make the trial of all legal business in the county where it arises, except in case of a change of venue as might be provided by law, mandatory, and thus confine the jurisdiction of the district courts within county limits, and place civil business on the same plane as criminal as to venue, also appears from the record of their proceedings (2 Proc. Const. Conv. 1503), where it will be seen that, when the provision in section 5 was proposed as an amendment, it contained after the word "law" the words "or upon consent of the parties, in writing, in civil cases." These words were objected to by an able lawyer upon the ground that they might interfere with the "general proposition for a change of venue in civil cases, whether the parties stipulated or not." The objection prevailed, and the words were stricken out. When the amendment was proposed, the mover, thereof, also a lawyer of ability, referring to the article of which the amendment forms a part, said: "I think the article by implication now would require that all the business should be transacted in the county where it arises. My only purpose was to make it certain that all the business should be tried in the county where it arises, and I want to add this with the qualification

26 Utah 27

there of cases where a change of venue might be taken as provided by law. There may be some criminal case where all the jurors in the county are prejudiced, and it would be necessary to remove it into another county; and then in civil cases, if parties want to stipulate it into another county, they can do so." It will thus be observed that the purposes of the mover of the amendment were clearly stated to the members of the convention, and acquiesced in, so far as appears from the record of proceedings, without a single dissenting voice, except as to the purpose of permitting, by stipulation in civil cases, a change in the place of trial, and, the advisability of such stipulation being questioned, that part of the amendment relating to it was stricken out, and thereupon the amendment in the shape of the provision in question herein was, as appears, unanimously adopted. It will further be observed that the mover of the amendment said his purpose was to make it certain that all the business should be tried in the county, etc., and "all the business" manifestly includes the bringing of suits as well as the trials of them, for clearly the bringing of suit is business, as much so as any other part of the legal proceedings. Likewise, when the constitutional provision says "all civil and criminal business" it means the bringing of suits as well as other legal business. Is it not clear, beyond all reasonable controversy, from these proceedings, and from the context of section 5, that the framers of the Constitution deliberately attempted and intended to compel all the legal business arising in any county to be commenced and tried in such county, except in cases of change of venue as might be provided by law; and, while conferring general jurisdiction over subject-matter upon the district courts, to confine such jurisdiction in each county to the territorial limits of the county, in the absence of such change of venue? If this be true—and it certainly seems to be verified by their language—then has it come to this: that, no matter what determination on the part of the framers of the Constitution, and of the

people who adopted the instrument, no matter what language is employed, no matter what purposes and objects actuated and controlled the framing of the instrument, when a district court has once been given general jurisdiction over subject-matter, such jurisdiction can not be confined to the limits of the county in which such court is sitting, not even by the sovereign power of the State? I must confess my inability to find any case either in England or America where ever before any court has so held, or has attempted to introduce such an innovation upon familiar rules of constitutional construction.

Undoubtedly a Constitution may prescribe the limits within which such a court may act, and restrict its power to act to cases arising within such limits, although the same class of cases may also arise in other parts of the State, and in such event it has no jurisdiction to try such cases arising without its territorial limits, although it has general jurisdiction of the same kind of subjects—that is, of the subject-matter—within its prescribed limits. "A court," says Mr. Bishop, "sitting outside of its local limits, is without authority." Bish. New Crim. Proc., sec. 317. It is equally true that under our Constitution a court is without authority as to cases or business arising outside its local limits, in the absence of an authorized change of venue. "The jurisdiction of a court means the power conferred upon it by the Constitution or statute to act within the prescribed limits, not exceeding the boundaries of the government creating it, over property within the State, citizens of the State, or persons coming within its jurisdiction, in relation to a subject-matter within the scope of the powers conferred upon it, to hear and determine, in the manner and at the place appointed by law, the issues between the parties, or any matter so lawfully brought before it." Brown on Jurisdiction, sec. 13; Bishop's New Crim. Proc., sec. 893; Ex parte Parker, 6 S. C. 472; People v. O'Neil, 47 Cal. 109.

Mr. Justice McCARTY says the construction given

in the Konold case, supra—which is the same as I now contend for—renders the provision here under consideration repugnant to the provision in section 12, article 1, Constitution, that in criminal prosecutions the accused shall have the right "to have a speedy public trial by an impartial jury of the county or district in which the offense is alleged to have been committed." I am unable to perceive any repugnance whatever between the two provisions under the construction given in that case, which in no manner changes the language of the instrument. The provision in section 5, it is true, does not mention district, but it provides for the granting of a change of venue by the Legislature, and when such change is granted as to any case such case may be tried in the district—that is, in some other county in the district—which would be in strict compliance with section 12, because it would give the defendant the right to have it tried in the county or district. The accused has no right to demand that his case be tried in the district outside the county where it arose, but simply that it be tried in such county or district. Construing the two provisions together as parts of the Constitution referring to the same subject, under the rule stated by his Honor, they mean that the case must be tried in the county where the business arose, except when a change of venue is granted, and that then the accused has a right to demand that it be tried in the district. This gives both provisions effect, and is in harmony with the plain intent of the makers of the Constitution.

We come now to the question whether, under our Constitution, the place of trial can be waived or changed by consent of the parties or otherwise, except by change of venue as may be provided by law. This court, in the Konold case, supra, and in numerous other cases, by unanimous opinion decided this question in the negative, upon the ground that the place of trial was, under section 5, jurisdictional, and upheld the provision in controversy as it appears in that section without any change in its language. My Brethren now, however,

say that a defendant may waive his right under the Constitution to have the case tried in the county where it arose by his failure to object at the time of the trial, or by his consent to have it tried in some other county. Having gotten rid of the effect of the constitutional provision by construction, as we have seen, they apply the common-law rules.   It is true some constitutional rights of a defendant in an action may be waived by him. This is so as to rights which are merely personal to him, mere personal privileges; but he cannot, by consent or otherwise, waive jurisdictional rights in which the public have an interest.   Nor can he by consent confer jurisdiction upon the court to try a case where otherwise it would have none.   Jurisdiction comes only from the law.   Consent of litigants cannot confer it. The Constitution may confer it or restrict it, and, if it does either, the courts and the Legislature are bound thereby, and the defendant may at any stage of a proceeding raise the point that the court is without jurisdiction.

In State v. Mortensen (decided at the present term) 26 Utah 312, 323, 73 Pac. 562, where the question of waiver was considered, this court said: "In general, the rights guaranteed to every accused person in a criminal action by the Constitution may be divided into two classes, those in which the public have an interest as well as the individual, and which are jurisdictional as affecting the power of the court to try the cause; and those in the nature of privileges which are merely personal to the accused, for his benefit, and do not affect the general public." We there held that of such rights those coming within the first class could not be waived, and that those falling within the second class could, in the absence of a constitutional or statutory restraint, be waived.   We further held that the defendant might, at any stage of a proceeding, raise the question that the court had no jurisdiction.   Now suppose it were admitted that the provisions of sections 5 and 12 were not, in express terms, mandatory, could then the litigants

waive the place of trial? Whether they could or not
would clearly depend upon the objects and purposes of
the provisions respecting public interests and benefit
in having the business arising in any county tried in
such county. Before the adoption of the Constitution,
as is well known, there were but four judicial districts,
each comprising many counties, and court, except in a
few instances, was held in but one county in a district.
The public and litigants were generally compelled to
travel long distances to transact legal business in the
district courts, although the probate business was then
transacted in each county. Notwithstanding the fact
that district court was generally held in but one county
in a district, cases were frequently transferred from
one district to another under the same system of pro-
cedure which my Brethren are now again restoring, in
the teeth of the Constitution, thereby increasing the
expense of litigants and the inconvenience to the public.
The plaintiff was not even confined to the district where
the business arose, but might bring his suit in any dis-
trict and have it tried there, unless a change of venue
was demanded in the trial court. This caused the busi-
ness to drift to the centers of population, vastly to the
disadvantage of the more remote counties. Referring
to this state of affairs, this court, in the Konold case,
said: "That the system was unsatisfactory to the pop-
ulace was notorious, and is evidenced by the radical
changes made by the Constitution, not only respecting
the place of trial and change of venue, but also the
places for the holding of terms of court, which terms,
under the state government, are to be held in every
county. Would it be reasonable, in view of these facts
and the circumstances which existed when the Constitu-
tion was framed, to hold that the framers of that instru-
ment, especially those from the counties whose people
were subject to the extra burdens and hardships, in-
serted into that instrument the provision of section 5,
above quoted, for no other purpose than to continue
in force the very practice and system which had been

notoriously condemned? This, too, in face of the fact
that the Constitution provides for the holding of terms
of court in every county of the State, and thus removes
the excuse for the existence of the former practice. Ev-
idently the intention was to prevent the Legislature
from continuing in existence what had been denounced
as a wrong, and possibly fears were entertained that,
under the practice in vogue, the business of the courts
would gravitate too much to the centers of population
in derogation of the more remote counties.'' How can
it be said, in the face of such facts and circumstances,
that the public has no interest in the place of trial, es-
pecially since the district courts now have also jurisdic-
tion of probate matters? Have not the people—the
public—of every county in this commonwealth an in-
terest in having their legal business transacted in the
county where it arises? Reading the Constitution thus,
in the light of history, it would seem absolutely appar-
ent that the framers of that instrument, and the people
in adopting it, must have regarded the public as being
interested in the place of trial of legal business. The
public having such interest, the place of trial falls within
the first class of constitutional rights above referred
to, is jurisdictional, and cannot be waived. *A fortiori*
is this true when the mandatory character of the pro-
visions of the Constitution are considered. Evidently
the provisions relating to the place of trial were made
mandatory so that each county should have the burdens
of its own litigation arising within its territorial limits,
and also reap the benefits growing out of it. The sys-
tem thus inaugurated—the displacement of the old, and
adoption of the new—thereupon became a public policy
of the State, and the public generally are interested in
it and in maintaining it.

It is apparent, therefore, that the district courts
in this State have no jurisdiction of the subject-matter
in cases arising outside of their territorial limits, and
have no jurisdiction to try such cases so arising, except
where change of venue is provided by law; and the law

is well settled that neither the agreement of parties, nor their consent, nor their failure to object can confer jurisdiction upon a court which otherwise would have none.   The State itself confers the jurisdiction.   "It is a maxim," says Judge Cooley, "in the law, that consent can never confer jurisdiction; by which is meant that the consent of parties cannot empower a court to act upon subjects which are not submitted to its determination and judgment by the law.   The law creates courts, and upon considerations of general public policy defines and limits their jurisdiction; and this can neither be enlarged nor restricted by the act of the parties." Cooley, Const. Lim. 491.   In Brown on Jurisdiction, sec. 10, it is said:   "The court is the creature of the law, and upon considerations of general public policy the law defines, limits, extends or restricts its jurisdiction, and the acts of the parties can neither enlarge nor restrict its powers by consent."   Again, in section 12, the author says:   "The State bestows the jurisdiction. Jurisdiction, being the power to judicially administer the law, must emanate from the sovereign power of the body politic it represents.   This power is derived, as we have before said, from the supreme power of the State."   In Bishop, New Crim. Proc., sec. 123, it is said:   "Jurisdiction comes solely from the law; in no degree from the consent of litigants.   So that neither consent nor anything else can authorize a court to act in a cause outside the sphere which the law has ordained for it."   In Oakley v. Aspinwall, 3 N. Y. 547, it was said:   "Where no jurisdiction exists by law, it cannot be conferred by consent; especially against the prohibition of a law which was not designed merely for the protection of a party to a suit, but for the general interests of justice."   So, in Mills v. Commonwealth, 13 Pa. 627, Mr. Justice Coulter, delivering the opinion of the court, said:   "It is contended that the counsel of the prisoner consented to his being tried at this adjourned court of quarter sessions, and, if they did, it ought not to weigh a feather in the scale of justice.   They may

have been ignorant of the law and of his rights, and therefore made no objection. But it is not the consent of counsel which can constitute a tribunal by which a citizen may be tried and punished. It is the law of the land, and that alone, which can constitute and establish such a tribunal. I need not repeat the authorities which establish that consent cannot give jurisdiction. In criminal proceedings especially that axiom has grown with the growth and strengthened with the strength of the law. Trials by lynch law might otherwise be valid; for at times I dare say a man might consent to their jurisdiction in hope or in fear, or perhaps in ignorance. But *autrefois acquit* or *autrefois convict* could not be pleaded in that case, nor in this, because it is a lawful trial only that can be effectually so pleaded." In Harris v. People, 128 Ill. 585, 21 N. E. 563, it was observed: "It is said that the right to a trial by jury is a right which the defendant may waive. This may be admitted, since every plea of guilty is, in effect, a waiver of the right to a trial by the legally constituted tribunal. But, while a defendant may waive his right to a jury trial, he cannot by such waiver confer jurisdiction to try him upon a tribunal which has no jurisdiction by law." Likewise, in Smiths v. County, 1 Iowa 492, it appears that a district court on appeal from a county court dismissed an application relating to a certain subject on the ground that the "county court was not authorized to entertain the application, coming at the time and in the manner it did before that court," although the county court had jurisdiction of such subject-matter. On appeal to the Supreme Court it was insisted that, no question having been made before the county court as to its authority to entertain the application, the objection came too late for the first time in the district court, and therefore should have been disregarded. Referring to the county court, the Supreme Court said: "No failure to object could confer upon the court a power to hear and determine a subject-matter which it was not authorized to try. In

other words, consent would not confer such jurisdic-
tion.'' In Morris v. Gilmer, 129 U. S. 315, 9 Sup. Ct.
289, 32 L. Ed. 690, Mr. Justice Harlan, delivering the
opinion of the court, said: ''This court must, upon its
own motion, guard against any invasion of the jurisdic-
tion of the circuit court of the United States as defined
by law, where the want of jurisdiction appears from the
record brought here on appeal or writ of error. At the
present term it was held that whether the circuit court
has or has not jurisdiction is a question which this court
must examine and determine, even if the parties forbear
to make it, or consent that the case be considered upon
the merits.'' So, in United States v. Rogers (D. C.),
23 Fed. 658, Mr. Justice Parker said: ''Jurisdiction
can be raised at any stage of a criminal proceeding.
It is never presumed, but must always be proved; and
it is never waived by a defendant. If this principle
be correct, it follows that the party who is charged with
a crime, and arrested in one district to be removed for
trial to another, can raise the question, as an objection
to his removal, that he cannot be tried in that other, or
that the trial cannot be had there for want of jurisdic-
tion in the court either over the person, the subject-
matter, or the place where the crime was committed.''
In Southern Exp. Co. v. Todd, 56 Fed. 104, 5 C. C. A.
432, Sanborn, Circuit Judge, said: ''The objection
urged by counsel for the defendant is that this action
could be brought against the Georgia corporation only
in the district of the residence of the plaintiffs in Texas,
or in that of the residence of the defendant, in Georgia,
and that, therefore, the circuit court for the Eastern
District of Arkansas was without jurisdiction. In an-
swer to the suggestion that this objection comes too late
after judgment against their client they invoke the rule
of the federal courts that if the want of jurisdiction is
discovered at any time before the final disposition of
the action it must be dismissed. The vice of this con-
tention lies in the fact that it confounds the jurisdiction
of the court with the personal privilege of the party.

When an action is brought in a circuit court, and it appears from the complaint or the record that there is a controversy between citizens of different States, and that the amount in dispute is sufficient under the acts of Congress, that court has jurisdiction, although it may not be brought in the district of the residence of either the plaintiff or the defendant. The essential jurisdictional facts in such a case are the diverse citizenship and the amount in controversy. These facts must, no doubt, appear upon the record, and where they do not appear the federal court may take notice of their absence, and dismiss the case at any stage of the proceedings. The cases to which we are referred by defendant's counsel as authority for the position that the defendant is not too late with its objection here are cases of this character.''

Likewise, under a constitutional provision that all actions for the recovery of the possession of, quieting the title to, or for the enforcement of liens upon real estate should be commenced in the county in which the real estate is situated, the Supreme Court of California, in an action to quiet an adverse claim to land, brought originally in a county other than the one where the land was situated, held, as also upon several occasions, that the court had no jurisdiction over the case, that this objection could not be waived, and that the action should be dismissed. Fritts v. Camp, 94 Cal. 393, 29 Pac. 867; Urton v. Woolsey, 87 Cal. 38, 25 Pac. 154; Gurnee v. Superior Court, 58 Cal. 88. In Haywood v. Johnson, 41 Mich. 598, 2 N. W. 926, a similar ruling was made. 1 Bish. New Crim. Proc., secs. 96, 316; Brown on Jurisdiction, secs. 4, 26, 26b, 27; 1 Freeman on Judgments, sec. 146; 4 Bl. Comm., 425, 426; Ex parte Parker, 6 S. C. 472; Plano Mfg. Co. v. Rasey, 69 Wis. 246, 34 N. W. 85; Shular v. State, 105 Ind. 289, 4 N. E. 870, 55 Am. Rep. 211; Dicks v. Hatch, 10 Iowa 380; Oil City v. McAboy, 74 Pa. 249; People v. Campbell, 4 Parker Cr. R. 386; People v. Hodges, 27 Cal. 340; People v. Myers, 1 Colo. 508; Board v. Thompson, 39 Ill. 566; Low v.

Rice, 8 Johns. 409; Clayton v. Per Dun, 13 Johns. 218; Richardson v. Welcome, 6 Cush. (Mass.) 331; Matter of Ryers et al., 72 N. Y. 1, 28 Am. Rep. 88; Fidler v. Hall, 59 Ky. 461; Peninsular Ry. Co. v. Howard, 20 Mich. 18; Scott v. Sandford, 19 How. 393, 15 L. Ed. 691; Jackson v. Ashton, 8 Pet. 148, 8 L. Ed. 898; Cameron v. Hodges, 127 U. S. 322, 8 Sup. Ct. 1154, 32 L. Ed. 132; Hegler v. Faulkner, 127 U. S. 482, 8 Sup. Ct. 1203, 32 L. Ed. 210; Metcalf v. Watertown, 128 U. S. 586, 9 Sup. Ct. 173, 32 L. Ed. 543.

The Chief Justice, in the White case, cites a number of cases on the question of waiver of constitutional and statutory rights, but upon examination it will be found that all of them refer to such rights as are merely personal for the protection and convenience of the defendant or the litigants—in the nature of personal privileges, in which the general public have no interest, and fall within the second class hereinbefore mentioned. I assert with confidence that no case, either in this country or in England, can be found, where, as in these cases, any court has ever, in construing a constitution, stricken out of a plain provision, not in conflict with another provision, a plain and unambiguous word, having a meaning harmonizing with the context, and used in its natural and ordinary sense, and substituted therefor one of its significations or some other expression, which restricted its meaning, and then held that the provision might be waived. These decisions become the more marvelous when it is considered that they are being rendered by a divided court, no two of the judges agreeing as to the construction of the Constitution that ought to prevail; and that they overturn not only a long line of cases, previously decided by the unanimous court, in which the same word and provision were considered, but also overturn a hitherto settled policy of the State, and leave the question of venue and jurisdiction in almost hopeless confusion and uncertainty.

The Chief Justice, in this case of Gibbs v. Gibbs, referring to the Konold and other cases in line with

it, says: "These decisions on the subject of venue do not establish any rule of property under which titles have been or can be acquired, but merely relate to a rule of practice. If such had been the case, notwithstanding my opinion that they are erroneous, and that I have, as a member of this court, dissented from the rendition of some of them, I would not assent to their disturbance." Respecting this last sentence it is but the statement of facts when I say that the Konold case and some others construing the provision in dispute were decided, and the policy relating to courts judicially declared, before the present Chief Justice became a member of this court. Mr. Justice McCARTY says: "There being, as above stated, no principle involved here that will or can disturb business rules and interests, or in any way affect property rights, as the question under consideration relates to practice, and not to substantive law, I join with the Chief Justice in overruling the case of Konold v. Ry. Co., supra, and all subsequent decisions of this court wherein they are in conflict or inconsistent with the conclusions reached in this case." He also says the "principles involved" do not "in the least degree disturb business affairs," nor relate to or "affect property rights," and that therefore, the rule of *stare decisis* does not apply. These are the excuses which my brethren offer for the unique constructions which, as has been seen, they have placed upon the Constitution, and for the overturning, as a sequence, a constitutionally and judicially declared public policy of the State. But do those decisions which they are now overruling neither relate to nor affect any rules of property or property rights? Suppose, under their rulings inaugurating the practice at common law, A sues B on a note, the consideration, $1,000 or $10,000, immaterial, in a county other than where the note was payable and the breach occurred, and recovers judgment, and B appeals to this court, and suppose further that at the next election, a year hence, there should be a change in the judges, and a majority of the court should

then feel that the language of the Constitution and its plain meaning was erroneously changed by substitution, and that the policy declared by the paramount law and a unanimous court in numerous decisions was erroneously overturned by a divided majority, and, under the circumstances, the majority of the court as it would then stand would, in consequence, feel bound and obligated to return to the well-beaten path, reverse the judgment, and dismiss the action, and suppose still further that in the meantime A's right to bring an action in the county where the note was made payable had become barred by the statute of limitations, would it or not affect property rights? Doubtless A would think it would upon finding that his right of recovery was gone, and his money lost. Suppose in like manner a case for the recovery of real estate, or upon contract, or one sounding in tort for damages, where the bar of the statute would become complete before decision rendered by the Supreme Court, would not property rights be affected? Are not all of these supposed cases such as may happen —even such as are likely to happen? Is there no danger ahead? And who can say just what rights adjudicated under the former decisions may or may not be affected by the present rulings? Is it not idle to talk about the grave questions and principles involved in this construction of the fundamental law of the State as not affecting and in no way relating to property rights and business affairs? What business man in this commonwealth, may I ask, can hereafter have confidence that the rule of law of to-day will be the rule of to-morrow? It is well known how timid business is respecting a vacillating court. With such vacillation as to important jurisdictional questions, how can any lawyer bring an action with any degree of confidence that it will not ultimately be dismissed and barred? Universally, under circumstances like these herein disclosed, the courts of the land have applied the maxim, "*Stare decisis, et non quieta movere*," and have refused to overrule or disturb rulings previously made, which had been,

as in this case, followed by the same court until they had ripened into settled law, and this whether they related to practice and jurisdiction and affected property rights indirectly, or whether they related directly to property rights.

We have here the anomalous spectacle in jurisprudence of a divided majority by constitutional construction, by substitution, where there is neither mistake, ambiguity, nor conflict, reversing a series of decisions previously made by a unanimous court, and overturning and setting at naught the very policy respecting venue which the organic law itself declares. The salutary rule of *stare decisis*, which has always upheld and preserved the dignity of courts, the stability of their decisions, the respect in which the people have been wont to hold high judicial tribunals, and the confidence which the populace has always maintained in the unwavering character of the rules of law declared by them, has been cast to the air. The rules of construction which through the centuries have supported and kept inviolate every constitution, every fundamental law, have, it appears, ceased to perform their functions, and it seems as though the time had come in the affairs of State when the servant may say to the master, "My will, not thine, be done." Even if it could be shown—a thing which, in my judgment, has not yet been shown—that the previous decisions were decided erroneously, would it not be better to permit the principles by them declared to stand, and refer the subject to the Legislature for submission, as provided by the Constitution, than to again plunge the important questions into uncertainty and confusion? Nothing in the affairs of men is so much to be dreaded as the uncertainty of a law. It has always been the policy of the highest courts and greatest jurists of our country to refuse to disturb a rule of law which had been established by a series of their decisions. Mr. Chief Justice Marshall, one of the world's greatest judges, when a similar question under a statute was before the court, said: "If this were a new

question, the court might decide otherwise; but the decision of the court in cases which have heretofore been before it has been expressed upon the point, and the bill must be dismissed for want of jurisdiction.'' Jackson v. Ashton, 8 Pet. 148, 8 L. Ed. 898. Greater must be the reason for such a decision, as that world renowned jurist announced, when the question is one which has previously been settled by the Constitution as well as by judicial decision. Mr. Justice McCARTY says, however, the Konold case was ''fruitful of much confusion and uncertainty in the bringing of actions;'' but what occasion there is for such an assertion it is difficult to comprehend, for certainly every lawyer of any practical skill whatever can readily ascertain where to bring the action in any case similar to the one referred to, and that the decision in the Konold case has had the indorsement of able lawyers has been frequently evidenced in this court. On numerous occasions have talented men in the profession stood before us and admitted that the place of trial, under our Constitution, was jurisdictional, and that the point could be raised at any time. In the White case, when the Chief Justice and a district judge, as a majority sitting in that case, for the first time questioned the principles announced in the Konold case, an able firm of lawyers became so earnest and zealous in maintaining the principles and doctrine declared in the latter case that they employed language which this court adjudged impertinent, and then struck the petition for rehearing, in which the language occurred, from the files. It is true the petition was afterwards, upon the request of counsel to be permitted to eliminate all objectionable matter, reinstated, but only upon condition that such language be eliminated. All these things tend to show that the profession does not regard the rulings in the Konold case in the light in which does my learned Brother.

I have thus in a feeble way, though at length, expressed my views respecting the grave questions involved in the cases under consideration, as dictated by

conscience and duty. For the reasons hereinbefore appearing, I must withold my concurrence to the construction which my Brethren have placed upon the Constitution.

Although I concurred in the result in the White case, I am now, upon more mature reflection, of the opinion that all the material points involved therein were erroneously decided, and that the petition for rehearing should be granted.

In this case of Gibbs v. Gibbs I also concur in the judgment. In such a case as this the right to sue is statutory. The Legislature may grant or withhold such right without committing any violation of the Constitution. Having granted it, it requires no great stretch of the imagination to apply the principles announced in the Konold case, and which were not departed from in Deseret Irrigation Co. v. McIntyre, 16 Utah 398, 52 Pac. 628, and permit the wife to apply for a divorce in the county of her residence, the only place where she has a remedy. In that place, among her friends and neighbors, where she is known, is where she received the injury. There is where she was humiliated, and the family relations were destroyed, and not in some other place where she probably had never been and was unknown. She is not suing to punish the culprit for his criminal act—the State alone having power to do that in the county where the act was committed—but to rid herself of one who, if her allegations be true, is no longer worthy of her love and respect, and who has degraded himself in the eyes of all respectable people, and violated the laws of God and man. In such case the courts will not refuse a remedy to redress the wrong.

In the case of Fields v. Daisy Gold Mining Co. I also concur in the judgment.